IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MARSHA L. GUDE,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| V. ) | Civil No. **05-582-MJR** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), plaintiff Marsha L. Gude, represented by counsel, is before the Court seeking review of the final decision of the Social Security Administration denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(i). **(Doc. 1).** In addition to submitting the administrative record **(Doc. 7 (hereinafter "R."))**, plaintiff and defendant have fully briefed their positions. **(Docs. 14 and 19).** This report and recommendation is respectfully submitted to United States District Judge Michael J. Reagan pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).

### Synopsis of the Procedural History

In September 2002 plaintiff Marsha L. Gude filed her application for DIB, alleging the onset of the disabling condition on June 25, 2001. **(R. 49-51)**.[1] Plaintiff's three treating physicians concluded that plaintiff suffered from spinal stenosis at L3-4 and L4-5 and admitted plaintiff for elective lumbar decompression with pedicle screw fixation and fusion. **(R. 130)**.

---

[1] Plaintiff's physician, Dr. Stanfield, authorized Plaintiff to be excused from work from June 25, 2001, to July 12, 2001. **(R. 142).**

1

ALJ Barbara J. Welsch denied plaintiff benefits in May 2005, finding that plaintiff retained the residual functional capacity to perform light and sedentary work [2], including activities associated with her past relevant work as a data entry clerk and telephone solicitor.  In addition, the ALJ found that claimant's past medical impairments did not prevent her from performing her past relevant work.  ALJ Welsch ultimately concluded plaintiff was not disabled for purposes of 20 § CFR §404.1520(f).  In reaching that decision, ALJ Welsch found plaintiff not fully credible with respect to her claimed symptoms and limitations. **(R. 5R)**.

While the ALJ did find plaintiff's impairments to be "severe" for purposes of 20 CFR § 404.1520(c), the same impairments were not found to meet or equal one of the presumptively disabling impairments in Appendix , Subpart P, Regulation No. 4.  **(R. 5R)**.  ALJ Welsch ultimately decided that plaintiff was not entitled to a period of disability or Disability Insurance Benefits.  **(R. 5R).**

Plaintiff submitted Request for Review of Hearing Decision/Order with Attachment of Issues. (no date) **(R. 5D – 5G)**.  On July 1, 2005, the Appeals Council denied plaintiff's request for review.  **(R. 5B, 12, 111)**.  Denial of plaintiff's request for review makes the ALJ's decision the final decision of the Social Security Administration.  Consequently, this matter is subject to review by the District Court, pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3).

---

[2]

    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

**20 C.F.R. § 404.1567(b).**

2

**The General Scope of Review**

The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404.  This Court reviews the decision denying plaintiff benefits to ensure that the ALJ's decision is supported by substantial evidence, and that no mistakes of law were made. *See* **42 U.S.C. § 405(g).**

As a preliminary matter, to be eligible for DIB, a claimant must be disabled during the time he or she was insured for benefits.  **42 U.S.C. §§ 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131.** To qualify for DIB a claimant must be "disabled."  "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. § 423(d)(1)(A).** A "'physical or mental impairment' is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  **42 U.S.C. §§ 423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her

age, education and work experience.  *See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); *see also* 20 C.F.R. §§ 404.1520(b-f).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).**  Thus, the Court must determine not whether plaintiff is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  *See* **Books v. Chater**, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).  Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence.  *Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled.  *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).  If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three).  If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Secretary at step four to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir.1984).

**Issues Presented**

Plaintiff Gude states that ALJ Welsch's conclusions are not supported by substantial evidence. More specifically, plaintiff argues:

1. Controlling weight should have been given to Dr. McKechnie's examination opinion in Exhibit 14F regarding his examination of the patient in December 2003, per Social Security Ruling 96-2p;

2. The ALJ erred by not granting a closed period of disability given evidence in the record of the claimant's significant back difficulty prior to her visit with Dr. Kennedy in July 2001 and notes by Dr. Kennedy in August 2002 indicating that her sitting was severely compromised.

3. The Listing of Impairments 1.00(B)(2)(D)(2) states that "the ability to walk independently once home without the use of assisted devices does not in and of itself constitute effective ambulation and therefore ALJ's references to the plaintiff's daily activities are insufficient to support an exertional level capable of being gainfully employed.

4. The ALJ cites no reason for stating that she did not find the pain limitations as alleged by the plaintiff, in patient's medical history and documentation from two treating orthopedic physicians, to be credible.

5. ALJ has not identified any substantial medical records that she relied upon in making her analysis that Claimant could perform the full range of light and or/ sedentary work and as such any hypotheticals based on the same are invalid.

6. ALJ's findings are against the manifest weight of the evidence and the ALJ should not have used or referenced Grid Regulations or vocational testimony without incorporating non-exertional impairments.

**(Doc. 18).**

The defendant Commissioner counters that the ALJ reasonably did not adopt the limitations recommended by Dr. McKechnie in his March 2005 letter, since they were inconsistent with both his contemporaneous notes in his most recent prior examination of plaintiff in December 2003, and his conclusion in March 2005 that the claimant had "no neurological abnormalities other than a right side diminished knee jerk." Further, the ALJ

5

reasonably weighed Dr. McKechnie's opinion against the opinions of plaintiff's other treating physicians, Dr. Snowden and Dr. Kennedy.  Dr. Kennedy and Dr. Snowden noted some complaints of pain, but none that involved disabling pain.

Defendant argues that the burden is on the plaintiff to show that she *could not* work for a one year closed period and not on the defendant to show that plaintiff *could* work for a one year closed period.  Defendant also argues it was reasonable to conclude that plaintiff's daily activities were inconsistent with her claimed disabling pain.  Furthermore, defendant contends plaintiff's treating physicians' failure to suggest greater limitations than found by the ALJ constitutes evidence that plaintiff could perform light or sedentary work. ***See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).**

Defendant takes issue with plaintiff's contention that the ALJ improperly used the "Grid Regulations," noting the ALJ's analysis stopped before determining whether or not plaintiff could perform other work, and as such the ALJ had no reason to consult the "Grid Regulations." In addition, defendant argues that plaintiff did not allege "non-exertional" limitations and therefore the ALJ did not err in omitting such limitations from his analysis.  **(Doc. 19).**

### Synopsis of Relevant Evidence

As early as January 25, 2001, plaintiff sought treatment for leg and back pain and increased pain during long periods of sitting. **(R. 71, 125-27)**.  Plaintiff saw a physical therapist on January 25, 2001, for evaluation, but failed to appear for four subsequent appointments between January 29, 2001, and March 22, 2001.  The subjective aspects of plaintiff's back ailment is a bit confusing.  On March 19, 2001, Dr. Stanfield noted that plaintiff had difficulty sitting for extended periods of time and that standing on her feet bothered her.  In contrast, Dr. Snowden's April 17, 2001, examination notes indicate plaintiff's pain was *not* associated with

prolonged sitting. **(R. 167)**.  Nevertheless, at that same time plaintiff was diagnosed with sciatic neuralgia, segmental dysfunction of lower lumbar spine, and myositis.  **(R. 127, 144)**.  An MRI in April 2001 revealed a L5-S1 disc protrusion with mild to moderate mass effect.  **(R. 113)**.  A few month slater, in July 2001, Dr. Kennedy observed spinal stenosis at L3-L4 and L4-L5. **(R. 208)**.

In May 2001 Dr. Stanfield reported that plaintiff continued to suffer with intermittent bouts of low back pain, radiating into her posterior region and inner thighs, despite epidural injections received the previous month.  **(R. 141).**  In August 2001 Dr. Snowden noted that plaintiff had been experiencing persistent pain and was unable to work for two months. **(R. 164)**. On August 27, 2001, Plaintiff was admitted for elective lumbar decompression with pedicle screw fixation and fusion at the L3-4 and L4-5 levels. **(R. 218)**.

On August 28, 2001, Dr. Kennedy performed spinal surgery on plaintiff, specifically a L3-4 and L4-5 laminectomy, while Dr. Robson performed a pedicle screw fixation and fusion between L3 and L5 and an iliac bone graft. **(R.132-33)**.  The following day, Dr. Kennedy performed a bilateral lumbar laminectomy between L3 and L5, and Dr. Robson performed a posterior spinal fusion with a left iliac crest bone graft at the same level. **(R. 134-5)**.

Dr. Kennedy noted in a post surgery examination on September 18, 2001, that plaintiff was "doing well," had some aching in her back.  **(R. 184).**   There were no compression deformities, no bilateral bone grafts or body lesions.  **(R. 207)**.  On October 30, 2001, Dr. Kennedy suggested that plaintiff begin physical therapy.  **(R. 183)**.

In December of 2001, Dr. Snowden noted that plaintiff was experiencing pain, but Dr. Snowden described pain only as intermittent. **(R. 162)**.  One month later in January 2002– just over four months after surgery– Dr. Kennedy concluded that there had been no significant

change; the L3-L5 through L5 vertebral bodies remained internally fixed by pedicle screws and vertical stabilization rods. **(R. 205).** Additional follow up visits with Dr. Kennedy in March and August 2002, and in January 2003, revealed no significant changes or complaints from plaintiff. **(R. 180, 202, 203).**

Plaintiff underwent a functional capacity evaluation on September 19, 2002, to determine her functional capabilities. **(R. 225-26)**. Primary limitations were found only with respect to lifting, and squatting/kneeling, which irritated plaintiff's knees. Plaintiff was found capable of light work. Although she complained of mild back pain on palpation, her range of motion was normal and pain free until she reached the extreme range of motion. Plaintiff was also found able to lift within the range associated with light work, lifting 16 pounds and carrying 24 pounds 100 feet. She could sit for 30 minutes, stand for 15 minutes, walk for 13 minutes and climbed 48 steps.

In March 2005, when plaintiff testified before ALJ Welsch, she described her daily activities, which included watching television, doing the dishes and laundry, cooking, and grocery shopping. Plaintiff also stated that she continued to drive periodically. Plaintiff reported attending church weekly, and Bible study intermittently. Plaintiff explained that she and her husband also babysit for their grandchild– apparently an infant– while their daughter worked during the week. Plaintiff described being able to tend to her personal hygiene and dressing, although she required assistance bathing. She had been working approximately two hours per day at a computer job, but when her computer broke she stopped working. **(R. 243-46).**

Plaintiff further testified that she was unable to climb stairs and that in order to ascend stairs she had to crawl up stairs when there was no railing available for assistance. Plaintiff stated that sitting for 20 minutes resulted in pain in her lower back and leg. In addition, plaintiff

indicated that she used a cane to walk and that during periods of great pain she had to drag her foot to continue walking. **(R. 253-55)**.

At the hearing, ALJ Welsch posed a hypothetical to vocational expert Dr. Lanier. The hypothetical was based on a person like plaintiff, who was 50 years old with a high school education, with past work experience like plaintiff's, and who was limited to light and sedentary work, and who could not perform jobs involving climbing, heights, crawling, crouching or kneeling, more than occasional bending stooping and twisting. **(R. 256).** Dr. Lanier opined that such a person could perform plaintiff's past work in telephone solicitation and data entry. **(R. 256).** Both jobs allowed for a sit/stand option and did not require prolonged walking. **(R. 256-257).**

Plaintiff's attorney also presented the vocational expert with a hypothetical reflecting plaintiff's description of her physical abilities– an individual who could stand for 20 minutes and sit for 10 to 15 minutes at a time without pain and requiring a 5 to 10 minute break every 30 minutes. Dr. Lanier responded that plaintiff's past relevant work would not allow for such break periods. **(R. 257-59).**

## Analysis

### The Treating Physicians' Opinions

Based on the medical record, the ALJ established that the medical opinions of plaintiffs' treating physicians consistently revealed that plaintiff's condition in the post-surgery position was improving.

Controlling weight must be given to the opinion of a treating physician *if*: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic technique"; and (2) the opinion is "not inconsistent with the other substantial evidence in the case record." **20 C.F.R.**

9

**§ 404.1527(d)(2); Social Security Ruling 96-2p, "Giving Controlling Weight to Treating Source Medical Opinions" (SSA 1996);** *see also Dixon v. Massanari,* **270 F.3d 1171, 1177 (7th Cir. 2001).** The record reveals that plaintiff was treated separately by three different physicians. All three physicians have opinions in the record, each of which must be assessed to determine which ones should be given controlling weight. Each medical opinion will be evaluated for its consistency against other substantial evidence in the record.

### Dr. Kennedy

Dr. Kennedy's examination of plaintiff on July 17, 2001, included analysis of lumbar myelogram results which suggested spinal stenosis at L3-L4 and L4-L5 levels. **(R. 212)**. In addition, the results of a CT Lumbar scan confirmed spinal stenosis at the L3-L4 and L4-L5 levels and that the degree of spinal stenosis is worsened in the standing position. **(R. 211)**. In September 18, 2001, Dr. Kennedy characterized plaintiff as "doing well" with some aching in her back. **(R. 184)**.

On October 30, 2001, Dr. Kennedy reported on the results of anteposterior, oblique and lateral views of the lumbar spine and determined that there were post-operative changes present, but no compression deformity or interspace narrowing. **(R. 206)**. In subsequent views that were obtained on January 8, 2002, Dr. Kennedy noted that there had been no significant change since October 31, 2001, and "no sign of prosthesis loosening or failure." **(R. 205)**. Similarly, in March 2002, after additional x-rays, Dr. Kennedy found that the L3 through L5 posterior fusion was unchanged. **(R. 204)**. Dr. Kennedy noted that plaintiff was doing "very well" and was ready for physical therapy. **(R. 183)**.

Dr. Kennedy examined plaintiff again on January 8, 2002, and noted that while plaintiff had some aching in her lower back with prolonged standing, she was doing "fairly well," overall.

**(R. 182)**.  Two months later, on March 5, 2002, Dr. Kennedy observed that plaintiff was having some pain in the right sciatic area with prolonged sitting, but her range of motion appeared to be "very good." **(R. 180)**.  Another examination on August 20, 2002, with further x-rays, led Dr. Kennedy to conclude that there were no significant changes. **(R. 203)**.  However, Dr. Kennedy's notes from his August 2002 examination indicated that plaintiff experienced some pain in the lower back, which was most noticeable when she engaged in any bending or twisting movement *when her back was loaded*.  According to Dr. Kennedy's record of the examination, plaintiff stated in that sitting for more than one and a half hours aggravated her back pain.  **(R. 180)**.

In May 2003, Dr. Kennedy observed some changes in the post-lateral fusion, but those changes were not deemed significant when compared to prior examinations.  **(R. 202)**.

Dr. Kennedy's records do not give a detailed evaluation of functional capacity, but from January 2002, six months after onset, plaintiff's low back pain was consistently linked only to prolonged standing, in excess of an hour and a half.  Plaintiff's range of motion was characterized as "very good."  Therefore, while not detailed, Dr. Kennedy's records support the ALJ's ultimate conclusion that plaintiff was not disabled for a period of 12 months or longer.

**Dr. Snowden**

Dr. Snowden first examined plaintiff on April 17, 2001, when plaintiff described a constantly aching low back pain that shot down both legs to the calf and heel, with pain on the left leg greater than the right leg. **(R. 167)**.  Following surgery, plaintiff was examined by Dr. Snowden on September 6, 2001, when she complained of a great deal of pain; she had been taking Percocet and Oxycontin for pain relief.  **(R. 163)**.

On December 16, 2001, plaintiff complained of an uncomfortable pain in her buttocks, passing into her legs. The pain worsened at night and was only relieved with pain medication,

11

Hydrocodone. Dr. Snowden concluded the pain was related to a nerve that had irritated patient prior to surgery. However, Dr. Snowden still thought plaintiff had progressed since her surgery, that her pain was only intermittent, and that she was getting better. **(R. 162)**.

In three follow-up examinations with Dr. Snowden, on July 11, 2002, September 23, 2002, and January 24, 2003, plaintiff's chief complaints involved sinus problems and coughing, not leg or back pain. **(R. 156-61)**. No subjective complaints of pain were included in Dr. Snowden's examination notes.

Dr. Snowden's records reflect that six months post onset plaintiff was experiencing only intermittent pain. Plaintiff did not complain about her back or related pain in subsequent exams in July 2002, September 2002, or January 2003. Thus, supporting the conclusion plaintiff's back ailment and pain were not significantly bothering her, and were not disabling for the requisite 12 month period.

### Dr. McKechnie

In December 2003, plaintiff was seen by Dr. McKechnie for evaluation of postoperative pain that radiated into her hips and legs. According to x-ray results, the pedicle screw at L4 on the right side appeared to pass through the top of neural foramen which was thought to explain the pain. **(R. 190)**.   A CT scan revealed the following:

> At the L3-L4 level there is no gross evidence of disc herniations, spinal stenosis, or neural foraminal narrowing. At the L4-L5 level there is the appearance of a broad based posterior disc osteophyte complex without evidence of asymmetry that would suggest disc herniation or spinal stenosis.

**(R. 187)**. Dr. McKechnie stated that while the distortion in the CT scan results made it difficult to evaluate the spinal canal, there did appear to be a fusion graft mass. Dr. McKechnie stated that since there was no neurologic deficit, except for a diminished knee jerk of the right leg, surgical

intervention was *not* recommended.; rather a trial of a TENS unit was deemed appropriate.  **(R. 189).**  Plaintiff did not see Dr. McKechnie again prior to the March 2005 hearing before ALJ Welsch.

In a March 28, 2005, letter per plaintiff's counsel's request, Dr. McKechnie diagnosed plaintiff as "post-op pedicle screw fusion L3-L5, partial spinal stenosis residual disc bulge lumbar spine." **(R. 228).** Dr. McKehnie noted that plaintiff continued to experience symptoms of night pain and that her legs became numb when sitting for periods of time.  However, Dr. McKechnie's diagnosis was based on his December 2003 examinations of plaintiff.   According to the 2005 letter, in 2003 plaintiff could not stand or walk for longer than 10-15 minutes or sit in one position for more than one hour at a time. **(R. 228)**.  Dr. McKechnie concluded that plaintiff was "totally disabled from all occupations which she is reasonably suited by education, training or experience."  **(R. 228)**.  Further, Dr. McKechnie opined that plaintiff's work restrictions would be permanent.  **(R. 228)**.

Dr. McKechnie based his March 2005 medical opinion solely on the examination and reports from his two December 2003 examinations and did not have any supplemental information or in-person examination since December 2003 to confirm his medical opinions.  His opinions thus appear stale.  In addition, Dr. McKechnie gave no explanation to support his conclusion that plaintiff's restrictions were indeed permanent.

ALJ Welsch accurately noted in her opinion that Dr. McKechnie based his conclusions on plaintiff's subjective report of symptoms on December 16, 2003.  **(R. 5N-O).**  ALJ Welsch noted that Dr. McKechnie's conclusion that plaintiff was "totally disabled" was in March 2005, when Dr. McKechnie was not actually treating plaintiff.  In addition, the ALJ noted that Dr. McKechnie's March 2005 conclusions were actually inconsistent with the findings of Dr.

13

McKechnie's own evaluations in 2003, where he noted that plaintiff had "no neurological deficit except for a diminished knee jerk in the right and that CT scan results produced no significant results.

Further, the ALJ correctly noted:

> "Dr. McKechnie does not indicate what information he has about the claimant's 'education, training, or experience' and has not provided any information regarding any expertise in vocational areas…the vocational conclusions of Dr. McKechnie are not given controlling as they are not supported by the record a whole, including the claimant's reported daily activities."

**(R. 5-O).**

Dr. McKechnie's medical conclusions conflict with those of Drs. Kennedy and Snowden, both of whom had a long-term treating relationship with plaintiff.

Insofar as Dr. McKechnie opined that plaintiff was disabled from all occupations, his opinion is inconsistent with other substantial evidence in the record, namely the vocational expert and plaintiff's own reported daily activities. There is nothing to support Dr. McKechnie's vocational conclusions and residual functional capacity.

The ALJ also discounted plaintiff's credibility by considering the Functional Capacity Evaluation results which stated that plaintiff could perform "light work" as defined by the Dictionary of Occupational Titles. The degree of plaintiff's pain is clearly inconsistent with the results of the Functional Capacity Evaluation.

### Residual Functional Capacity

Social Security Ruling 96-8p dictates that a residual functional capacity assessment include a narrative discussion describing how the evidence supports the ALJ's conclusion, citing

specific medical facts.  Ruling 96-8p also requires that medical source opinions must always be considered and addressed by the ALJ in the assessment, and if a medical opinion conflicts with the ALJ's conclusions then the ALJ must explain why it was not adopted.

Plaintiff was found to have a residual functional capacity for light and sedentary work.

> The claimant has not presented credible evidence that she lacks the residual functional capacity to perform a limited range of light and sedentary work (as those terms are defined in the regulations) ; work that does not require climbing, work at unprotected heights, crawling, crouching, kneeling, or more than occasional bending, stooping or twisting….  In assessing the claimant's residual functional capacity, the undersigned has considered the claimant's complaints of pain and resulting functional limitations, but do not find them credible…the degree of pain and limitation alleged by the claimant is not consistent with the objective medical evidence regarding these impairments, or her functional ability, including her reported daily activities.

**(R. 5-O).**

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

**20 C.F.R. § 404.1567(b).**

According to Social Security Ruling 83-10, sedentary work requires no more than two hours standing or walking during an eight hour work day.  Medium work requires six hours of standing which by implication establishes a range or two to six hours of required standing in an eight hour work day.  As such, the minimum standing requirement to satisfy the definition of light work is two hours. According to the Functional Capacity Evaluation Summary Report, Plaintiff's positional tolerance testing yielded:

       1. Tolerance of thirty minutes of sitting;

       2. Fifteen minutes of standing;

       3. Thirteen minutes of walking;

       4. Stair climbing of 48 steps;

       5. Sustained bending on an occasional basis; and

       6. Repetitive bending, overhead reaching and forward reaching on a frequent basis.

**(R. 225-226)**.

The report of plaintiff's residual functional capacity also indicated plaintiff was able to function in the light category of work according to the Department of Labor Standards. That conclusion is consistent with the findings that plaintiff could occasionally lift 16-25 pounds (depending on the height of the lift), and she could carry 24 pounds 100 feet. **(R. 225).** Furthermore, the report noted that plaintiff's only primary limitation was due to knee irritation caused by lifting and squatting/kneeling positions. **(R. 225).**

Drs. Kennedy and Snowden's medical opinions, supported by test results, are consistent with the conclusion that plaintiff can perform light work. Post surgery exams also support the ALJ's assessment. ALJ Welsch noted that the examinations following plaintiff's spinal fusion surgery only revealed:(1) normal range of motion; (2) intact strength; (3) normal motor and sensory examination; and (4) negative straight leg raising. X-rays after surgery revealed the hardware to be in place, stable and no fracture in prosthesis. **(Exhibits 6F, 7F, 9F ; R. 154 , 155-70, 179-86)**.

Reading the ALJ's opinion as a whole, it is clear that she found plaintiff's testimony about her pain and physical limitations inconsistent with the medical evidence.

One need only review the summary of the evidence above to reach the same conclusion. This is not a case of contradictory medical evidence; rather, there is a glaring lack of evidence of impairment anywhere near what plaintiff would have the Court believe. Accordingly, this Court finds substantial evidence to support the ALJ's residual functional capacity assessment and no error.

### Vocational Testimony

At the evidentiary hearing, ALJ Welsch posed a hypothetical to the vocational expert premised on the aforementioned residual functional capacity for light and sedentary work, albeit with some postural limitations. Based on the substantial evidence in the record of plaintiff's residual functional capacity, there does not appear to be an error in the hypothetical. The vocational expert determined and the ALJ subsequently decided that the Plaintiff was able to perform past relevant work, even with postural limitations. **(R. 5R)**. Having rejected plaintiff's claimed residual functional capacity, which would preclude all work, there is no error in the ALJ's hypothetical, or her reliance on the vocational expert's testimony that plaintiff could perform her past work.

### Closed Period of Disability

ALJ Welsch did not discuss a closed period of disability per se, as no such one year period of continuous disability existed.

> [A]n individual shall be considered to be disabled for purposes of this title [42 USC §§ 1381 et seq.] if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

**42 U.S.C. § 1382(c)(3)(A).**

17

According to Dr. Kennedy, plaintiff was unable to work for about a seven month period from August 28, 2001, to March 5, 2002. **(R. 194).** There is no evidence in the record that any of plaintiff's treating physicians stated that plaintiff was unable to work for more than a continuous one year period.  Moreover, plaintiff has the burden of proving that she was unable to work for a continuous one year period.  The burden does not fall on the defendant to prove that plaintiff could work.  **42 U.S.C. § 423 (d)(5)(A)**.

### Plaintiff's Credibility

Substantial medical evidence in the record supports the ALJ's conclusion that plaintiff did not provide credible evidence that she is unable to perform limited light and sedentary work. According to the regulations, sedentary work involves:

> [l]ifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

**20 C.F.R. § 404.1567(a)**.

Based on the substantial evidence of the record, including the sitting limitations contained in the September 2002 functional capacity evaluation, and even Dr. McKechnie's examination plaintiff in December 2003, plaintiff's ability to sit without pain would be either 30 minutes or 1 hr respectively.  Plaintiff's hearing testimony that she is only able to sit for twenty minutes is not credible given this brief period of sitting time is not consistent with other substantial evidence in the record. **(R. 225, 228)**.  In addition, the vocational expert explained that plaintiff's previous work permitted a sit/stand option.

In addition, as noted by the ALJ, plaintiff's subjective complaints– particularly the degree of pain– are inconsistent with the residual functional capacity for light work and the daily

activities (even though somewhat limited) specified in plaintiff's filings (Activities of Daily Living Questionairre and Reconsideration Report) and her hearing testimony. **(R. 97, 88, 253-56)**.

### Application of Grid Regulations

ALJ Welsch did not even consider the Grid Regulations, contrary to plaintiffs contention. The five step analysis stopped at step four, when the ALJ determined that plaintiff could perform past relevant work based on her residual functional capacity. The Medical Vocational Guidelines, 20 C.F.R Part 404 subpart P, Appendix 2, also referred to as the "grids" were not applied, as they are only applied when the claimant is unable to perform past relevant work. Since this is not relevant in the case at bar, the ALJ properly did not employ the grids to determine what "other work" plaintiff could perform.

### Recommendation

For the aforestated reasons, the Commissioner's decision denying plaintiff Marsha L. Gude's application for Disability Insurance Benefits or a Period of Disability should be affirmed in all respects, as the decision is supported by substantial evidence.

**SUBMITTED: January 30, 2007**

    **s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

**Notice of Response Deadline**

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(e), the parties shall file any objections to this report and recommendation on or before **February 16, 2007**.